## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| ) | |
| **v.** ) | **Criminal No. 18-10083-DJC** |
| ) | |
| **CHARLIE JINAN CHEN,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                **January 22, 2019**

## I.      Introduction

Defendant Charlie Jinan Chen ("Chen") has moved to suppress statements made to law enforcement agents at his restaurant on March 30, 2016. D. 53. Having considered the motion, the government's opposition, D. 57, Chen's reply brief, D. 62 and the evidence presented at the evidentiary hearing on December 19, 2018, D. 65, 67, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

## II.     Findings of Facts

These findings are based upon the testimony of Federal Bureau of Investigation ("FBI") Special Agents ("SA") John Keelan and Ryan Lane during the December 19th hearing.

## A. Investigation of Vistaprint Trading

Chen's motion to suppress concerns his March 30, 2016 interview by SA Keelan and Lane. The agents conducted this interview in the course of investigating allegations of insider trading in Vistaprint N.V. ("Vistaprint") securities. D. 67 at 21. In the course of the investigation, the FBI received information that an individual who worked in financial forecasting at Vistaprint, Jenny Xu and/or her spouse, Kun Xu, allegedly provided Chen with material nonpublic information ("MNPI") concerning Vistaprint's quarterly financial performance upon which he allegedly traded.

## B. Special Agents Interview Chen at His Restaurant

The agents' purpose in interviewing Chen on March 30, 2016 was to inquire about his suspicious options trading in Vistaprint stock. D. 67 at 8. At the time of the interview, the agents considered Chen, and others, in the agents' parlance, a focus, subject or target of their investigation. D. 67 at 23-24, 44, 79-80. The agents had intended to interview Chen at his residence, but he left his home that morning with his children to drop them at school, so the agents instead decided to interview him at his restaurant, Feng Shui, in Chelmsford, Massachusetts. D. 67 at 9, 50. Shortly after 10 a.m., the agents arrived at the restaurant. D. 67 at 50. It was not clear that it was open for business, but restaurant employees were present. D. 67 at 9-10, 22, 52. The agents introduced themselves to Chen as FBI agents, displaying their credentials, and explained that they wanted to ask him some questions about his trading. D. 67 at 10, 53. Chen showed them to a booth in the restaurant so that they could sit down. D. 67 at 10, 54. The agents sat across from Chen in the booth. D. 67 at 11. Although the agents were armed, their firearms were not visible. D. 67 at 11-12, 52.

After the three sat down in the booth, the agents asked Chen questions about his stock trading. D. 67 at 12. In response to their questions, Chen described himself as a day trader, but indicated that he did not recall specifically what options trading he had done in Vistaprint. D. 67 at 12-13, 26, 60-61. He acknowledged that he was familiar with Vistaprint and followed the company, but Chen denied knowing anyone who worked there. D. 67 at 14, 70. The agents specifically asked Chen about whether he knew Kun ("Kevin") Xu, the husband of Jenny Xu, who was a former accountant at Vistaprint. D. 67 at 14-15. Although he initially said he did not recognize his name, he indicated that he knew "Kevin," as a fellow parent from his daughter's school, but only as an acquaintance. D. 67 at 15, 29, 61-62, 70. He also indicated that he had not spoken with Kevin about Vistaprint. D. 67 at 15. Chen indicated that he was aware that Kevin was married to Jenny Xu, but that he did not know where she worked, thought that she might work in real estate, and that he had not spoken to her about Vistaprint either. D. 67 at 16, 64. When the agents showed him some telephone records indicating his calls with Kevin, Chen responded that those calls were about his purchasing an apartment or condo in Lexington. D. 67 at 17, 63. Although the agents asked Chen numerous questions, they all concerned his relationship with Kevin and trading in Vistaprint. D. 67 at 44. The agents asked their questions in English and Chen responded in English and there was no indication that Chen did not understand the questions. D. 67 at 58-59.

The initial interview lasted less than half an hour. D. 67 at 17, 56. After leaving and going to the parking lot and speaking with the case agent (who was conducting a simultaneous interview of Kevin at another location, D. 67 at 23), SA Keelan and Ryan returned to the restaurant to ask Chen some followup questions. D. 67 at 18, 66. They indicated to Chen that they had some

additional questions and, this time, Chen invited them upstairs to his office. D. 67 at 18, 42. Among other things, Chen denied again having spoken with Kevin about trading in Vistaprint. D. 67 at 18. This followup meeting did not last more than five to ten minutes. D. 67 at 19. 68.

The agents described the tone of the interviews as professional and cordial and that they did not raise their voices to Chen. D. 67 at 19, 41, 57. Other than a handshake, the agents had no physical contact with Chen. D. 67 at 19, 57. They did not obstruct his exit or otherwise prevent him from leaving or speaking with anyone. D. 67 at 20, 55. The agents did not place Chen under arrest and had no intent to arrest him that day. D. 67 at 12, 24, 54. They did not give him <u>Miranda</u> warnings because he was not under arrest. D. 67 at 21, 56, 75. The agents did not advise Chen that he did not have to speak with them or that he could consult with an attorney. D. 67 at 75. Although they advised him on several occasions during the interview that lying to a federal agent was a federal crime, D. 67 at 16, 34-35, 64-65, they never told Chen that he had to answer their questions. D. 67 at 12, 20, 35, 56.

## III. Discussion

### A. <u>Miranda Warnings and Custodial Interrogations</u>

Chen seeks to suppress his statements to Keelan and Lane on the grounds that they failed to give him <u>Miranda</u> warnings prior to his questioning on March 30, 2016. It is well established that prior to a custodial interrogation, police must give <u>Miranda</u> warnings to a person accused of criminal conduct. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966); <u>United States v. Guerrier</u>, 669 F.3d 1, 5 (1st Cir. 2011); <u>see</u> <u>United States v. Gonzalez</u>, 719 F. Supp. 2d 167, 170-71 (D. Mass. 2010) (discussing <u>Miranda</u>). The trigger for such warnings, however, is whether the person is in

custody since "precustodial questioning does not require <u>Miranda</u> warnings." <u>Guerrier</u>, 669 F.3d at 5.

Whether a person is in custody is a mixed question of law and fact. <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995). This determination involves a two-part analysis. "[F]irst the court examines the circumstances surrounding the questioning and then it sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." <u>Guerrier</u>, 669 F.3d at 6. As to the first inquiry, a court may consider a number of factors including "(without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." <u>Id.</u> (quoting <u>United States v. Teemer</u>, 394 F.3d 59, 66 (1st Cir. 2006)); <u>United States v. Hinkley</u>, 803 F.3d 85, 90 (1st Cir. 2015). As to the second inquiry, it is an objective standard that applies. <u>Keohane</u>, 516 U.S. at 112. That is, the Court must consider "how a reasonable man in the [defendant's] position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984). Ultimately, the court must to determine whether there a formal arrest or restraint on freedom of movement that is the functional equivalent of formal arrest." <u>Id.</u>

### B. <u>Chen was Not in Custody and *Miranda* Warnings Were Not Warranted</u>

Having considered the totality of the circumstances involving the agents' March 30th interview of Chen, the Court concludes that Chen was not in custody. Numerous factors weigh in support of this finding. The agents interviewed Chen in his restaurant after he consented to letting them in and sitting down with them, apparently prior to the restaurant's operation hours (but while other employees were present in the building). <u>See, e.g.</u>, <u>United States v. Lemon</u>, 714 F. App'x 851, 858 (10th Cir. 2017) (noting that an interview that occurred, "not in an unfamiliar

environment, but in Defendant's own work place," did not rise to the level of custodial interrogation); United States v. Maldonado, 562 F. App'x 859, 861 (11th Cir. 2014) (considering, among other circumstances, the fact that the defendant was in the familiar surroundings of her workplace when questioned in determining that the defendant's statements were not made during a custodial interrogation); United States v. Crooker, 688 F.3d 1, 11 (1st Cir. 2012) (noting that the defendant "was questioned in familiar surroundings where, in general, questioning tends to be significantly less intimidating than questioning in unfamiliar locations"); United States v. Rorex, 737 F.2d 753, 756 (8th Cir. 1984) (explaining that an agent's questioning of a defendant "on his own turf," i.e., at his place of business, did not constitute custodial interrogation that would require Miranda warnings). Moreover, although the agents did not tell Chen he was free to leave, the agents did not display brandish their weapons or impede Chen's movement throughout the entirety of their encounter. By the agents' accounts, the interviews remained cordial and professional. Additionally, neither the initial interview (less than half an hour) nor the followup interview (five to ten minutes) lasted for very long.

On the other side of the balance, the Court is aware that the interviews were conducted in English, which, has been suggested, is not Chen's first language. On the record before the Court, however, Chen responded to the agents' questions in English and there was no indication by him or by the substance of his answers that he did not understand the questions. Moreover, even if there was such indication, such factor alone would not turn an otherwise non-custodial interview into a custodial interrogation. See Thatsaphone v. Weber, 137 F.3d 1041, 1046 (8th Cir. 1998) (holding that the defendant's "limited understanding of the English language provides no objective basis to change [the court's] conclusion that [the] interview was non-custodial").

Given the totality of these circumstances, the Court does not conclude that a reasonable person in Chen's shoes would have concluded that he was not free to leave. When considering all of the circumstances of September 30, 2016 interview, none of them amounted to the level of restraint associated with a formal arrest (or the functional equivalent of same) such that a reasonable person would not have felt free to leave. See, e.g., United States v. White, 270 F.3d 356, 366 (6th Cir. 2001). Accordingly, the agents were not required to give Miranda warnings to Chen and there is no basis to suppress the statements that he made to the agents during the March 30th interviews.

IV. **Conclusion**

For all of the aforementioned reasons, the Court DENIES Chen's motion to suppress, D. 53.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge